UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **MORGAN STANLEY SMITH BARNEY LLC,** | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:13-CV-01598 (VLB) |
| v. | : | |
| | : | |
| **DENIS O'BRIEN,** | : | |
| Defendant. | : | November 6, 2013 |

### MEMORANDUM OF DECISION GRANTING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Before the Court is Morgan Stanley Smith Barney LLC's ("Morgan Stanley") Motion for Preliminary Injunction filed on October 31, 2013 against Denis O'Brien ("O'Brien") pursuant to Federal Rule of Civil Procedure 65. The Plaintiff seeks an order directing the Defendant and anyone in concert with him to return to Morgan Stanley any customer information O'Brien removed from Morgan Stanley at any time during his employment, enjoining the Defendant and anyone in concert with him from using in any way any confidential information to solicit Morgan Stanley customers or to furnish such material to anyone else, and enjoining Defendant and anyone in concert with him from soliciting or attempting to solicit any customer O'Brien served or whose name became known to O'Brien during his tenure with Morgan Stanley.

Based upon the parties' briefs, supporting affidavits filed therewith and the information presented at the November 4, 2013 hearing on the Motion for Preliminary Injunction, the Court finds the following facts:

1

Denis O'Brien was employed by Morgan Stanley as a financial advisor. In connection with his employment, O'Brien signed a Financial Advisor Employment Agreement (the "Agreement") on August 30, 2004, containing restrictive covenants pertaining to solicitation of customers and the use and dissemination of confidential information. [Dkt. #1, Agreement, p.1]. Paragraph 2.3 of the Agreement states, in relevant part:

> You agree that, during the course of your employment with Morgan Stanley or otherwise, you will not remove Trade Secrets or other Company Records from the premises of Morgan Stanley in either original or copied form, except in the ordinary course of conducting business for, and subject to approval by, Morgan Stanley. You also agree that you will not use Trade Secrets or other Company Records for any purpose other than the purpose of conducting the business of Morgan Stanley. You further agree that (a) your use of Trade Secrets and other Company Records will stop immediately upon the suspension or termination of your employment relationship with Morgan Stanley; (b) you will immediately deliver to Morgan Stanley, at the time of suspension or termination of your employment or at any other time upon Morgan Stanley's request, any Trade Secrets or other Company Records in your possession or control … In addition, you agree that, should you decide to terminate your employment with Morgan Stanley, your use of Trade Secrets and other Company Records will stop immediately and permanently, unless otherwise agreed to by Morgan Stanley.

[Dkt. #1, Agreement, ¶2.3]. Pursuant to paragraph 2.1, Trade Secrets include "customer files, lists, and holding pages" and "the names, addresses, telephone numbers, and assets and obligations carried in the accounts of Morgan Stanley's customers." [Dkt. #1, Agreement, ¶2.1].

2

**Paragraph 3.2 of the Agreement proscribes O'Brien's ability to solicit Morgan Stanley's customers for one year after the termination of his employment:**

> **For a period of one year following termination of employment for any reason, you will not solicit or attempt to solicit, directly or indirectly, any of Morgan Stanley's customers who were served by you, or whose names became known to you, while in the employ of Morgan Stanley or as a result of your employment with Morgan Stanley, with respect to securities, commodities, financial futures, insurance, tax advantaged investments, mutual funds or any other line of business in which Morgan Stanley or any of its affiliates is engaged. For purposes of this provision, the term "solicit" includes initiation of any contact with customers for the purpose of conducting business with or transferring accounts to any other person or firm that does business in any line of business in which Morgan Stanley or any of its affiliates is engaged.**

**[Dkt. #1, Agreement, ¶3.2]. The Agreement provides that "any controversy or claim arising out of or relating to" either O'Brien's employment by Morgan Stanley or the Agreement will be settled by arbitration before the Financial Industry Regulatory Authority ("FINRA").[1] The Agreement, however, expressly allows Morgan Stanley to seek injunctive relief from a court of competent jurisdiction should O'Brien breach the restrictive covenants enumerated above, and further stipulates to expedited arbitration hearing procedures in the event that a court grants injunctive relief. [Dkt. #1, Agreement, ¶¶4.1, 4.2]. Pursuant to**

---

[1] **Paragraph 7.1 specifically calls for arbitration before either the National Association of Securities Dealers, Inc. ("NASD") or the New York Stock Exchange. FINRA "was created through the consolidation of NASD and the member regulation, enforcement and arbitration operations of the New York Stock Exchange," effective July 30, 2007. See** http://www.finra.org/Newsroom/NewsReleases/2007/p036329.

3

Rule 13804 of FINRA's Code of Arbitration Procedure, "[i]f a court issues a temporary injunctive order, an arbitration hearing on the request for permanent injunctive relief will begin within 15 days of the date the court issues the temporary injunctive order."  FINRA Code of Arbitration Procedure for Industry Disputes, Rule 13804(b)(1), *available at* http://finra.complinet.com/en/display/display_main.html?rbid=2403&element_id=4193.

In 2009, Morgan Stanley became a signatory to the Protocol for Broker Recruiting (the "Protocol"), the express "principal goal" of which is "to further the clients' interests of privacy and freedom of choice in connection with the movement of their Registered Representatives [RRs] between firms" and which forecloses any liability a departing RR or his or her new firm may incur by reason of the RR taking certain information with him or her upon leaving one firm for another.  [Dkt. 20-1, Protocol, p. 1].  Signatories to the Protocol "agree to implement and adhere to it in good faith."  [*Id*.].  Pursuant to the Protocol,

> [w]hen RRs move from one firm to another and both firms are signatories to this protocol, they may take only the following account information: client name, address, phone number, email address, and account title of the clients that they serviced while at the firm (the 'Client Information') and are prohibited from taking any other documents or information. Resignations will be in writing delivered to local branch management and shall include a copy of the Client Information that the RR is taking with him or her.  The RR list delivered to the branch also shall include the account numbers for the clients serviced by the RR.  The local branch management will send the information to the firm's back office.  In the event that the firm does not agree with the RR's list of clients, the RR will

4

> **nonetheless be deemed in compliance with this protocol so long as the RR *exercised good faith in assembling the list* and substantially complied with the requirement that only Client Information related to clients he or she serviced while at the firm be taken with him or her.**
>
> **To ensure compliance with GLB and SEC Regulation SP, the new firm will limit the use of the Client Information to the solicitation by the RR of his or her former clients and will not permit the use of the Client Information by any other RR or for any other purpose. . . .**

[*Id.* (emphasis added)].

On Thursday, October 24, 2013, O'Brien printed a list of his customers from Morgan Stanley's database and then, without Morgan Stanley's knowledge, changed 206 contact telephone numbers for 156 of his customer accounts in Morgan Stanley's computer system between 2:00 and 4:00 pm. [Dkt. 1, Verified Complaint ¶9]. O'Brien also left some telephone numbers intact. On Friday, October 25, 2013 O'Brien resigned from Morgan Stanley without prior notice, and left a copy of the list he had generated the day before with Morgan Stanley, purportedly pursuant to the Protocol, and containing the correct telephone numbers of his customers. He advised Morgan Stanley that he was taking a copy of this list with him. O'Brien has affirmed that he began his affiliation with Raymond James Financial Services, Inc. ("Raymond James") immediately following his resignation from Morgan Stanley. [Dkt. 21, O'Brien Declaration ¶1]. Raymond James is a signatory to the Protocol for Broker Recruiting. [Dkt. 20-1, Protocol].

Following his resignation, Morgan Stanley reassigned O'Brien's customers to four financial advisors who, because they were unaware that O'Brien had changed many telephone numbers in Morgan Stanley's computer system, were unable to contact various customers for several days. After receiving consistent reports that the four new financial advisors were unable to contact O'Brien's customers at the phone numbers on the computer system, Morgan Stanley asked its Information Technology department on Tuesday, October 29 to investigate. The IT department in turn reviewed the records of O'Brien's customers, which reflected the changes to various customers' telephone numbers. The IT department completed its review of the records by Wednesday, October 30, 2013.

O'Brien has affirmed that he has used the information in the list he took with him from Morgan Stanley to contact his clients, inform them of his new employment and contact numbers, and ask them to continue to do business with him. [Dkt. 21, O'Brien Declaration ¶12]. As of the date of the hearing, approximately fifteen customers had chosen to leave Morgan Stanley and follow O'Brien to Raymond James.

Morgan Stanley moves for injunctive relief on the basis that O'Brien has violated the letter of the Protocol by failing to prepare the list he left for Morgan Stanley in good faith and further has violated the express purpose and the spirit of the Protocol by changing the contact information of more than 150 customers in bad faith and in an attempt to thwart Morgan Stanley's communication with its clients, causing irreparable harm to Morgan Stanley's relationship with its clients. Morgan Stanley further argues that because O'Brien breached the Protocol the

6

restrictive covenants in his employment Agreement must control, and O'Brien has breached these covenants by soliciting clients and removing trade secrets from Morgan Stanley's possession. O'Brien, on the other hand, asserts that he has complied with the letter of the Protocol and is therefore entitled to possess and use the list of customer contact information he took with him from Morgan Stanley. Both parties agree that the Protocol governs a registered representative's entitlement to customer information upon his departure from a member firm and establishment at another member firm and that, where the registered representative is also subject to restrictive covenants that conflict with the Protocol, the restrictive covenants are applicable only when the registered representative has breached the Protocol.

"A preliminary injunction may be granted only upon a showing of (1) likely irreparable harm, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, with the balance of hardships tipping decidedly in the movant's favor." *Verzani v. Costco Wholesale Corp.*, 387 F. App'x 50, 51 (2d Cir. 2010) (citing *Doninger v. Niehoff*, 527 F.3d 41, 47 (2d Cir. 2008)). "A showing of irreparable harm is the 'single most important prerequisite' for issuance of a preliminary injunction." *Id.* (quoting *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)). Injunctive relief, though, "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis and citation omitted). Further, "[w]here there is an adequate

7

remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore v. Consol. Edison Co. of New York, Inc.*, 409 F.3d 506, 510 (2d Cir. 2005).

**Likelihood of Success on the Merits**

On the basis of the factual findings delineated above, the Court finds that Morgan Stanley has shown a likelihood of success on the merits. Although O'Brien argues that he has complied with the four corners of the Protocol and is thus entitled to its protections from liability, he has violated the spirit of the Protocol, the prohibition against bad faith expressly contained in the Protocol, and the express purpose of its creation to protect brokerage clients' rights of choice and privacy. The Protocol unequivocally proclaims that its "principal goal" is "to further the clients' interests of privacy and freedom of choice in connection with the movement of their Registered Representatives [RRs] between firms." [Dkt. 20-1, Protocol, p. 1]. Signatories to the Protocol "agree to implement and adhere to it in good faith." [*Id.*]. O'Brien's deliberate use of the Morgan Stanley computer system and his calculated corruption of more than 200 customer telephone numbers ostensibly to prevent Morgan Stanley from immediately contacting his portfolio of clients upon his departure evidences bad faith and a contempt for his clients' right to freely choose whether to remain with Morgan Stanley or to follow him to Raymond James. Moreover, O'Brien's conduct deprived Morgan Stanley's customers of information necessary to make informed decisions to either maintain their accounts at Morgan Stanley or

transfer their accounts to Raymond James. O'Brien has offered no explanation for his conduct.

Although the Defendant has complied with the *technical* aspects of the Protocol – namely, providing a copy of his clients' names, addresses, telephone numbers, email addresses, and account titles to Morgan Stanley with his resignation – he did not do so in good faith because the telephone numbers on the list he left were different from the erroneous telephone numbers he entered on Morgan Stanley's computer database. Although he argues that Morgan Stanley possessed numerous methods of obtaining the correct telephone contact numbers for the clients in question, O'Brien undoubtedly intended and knew, after working at Morgan Stanley for approximately nine years, that his corruption or Morgan Stanley's database by altering the telephone numbers in its computer system would create delay and confusion and would impede Morgan Stanley's ability to communicate with the clients. Leaving Morgan Stanley with a paper copy of his the client list containing the correct telephone numbers was tantamount to a misrepresentation in furtherance of his sabotage. O'Brien's deliberate sabotage of Morgan Stanley's client records deprived customers of the right to make an informed decision to either maintain their account at Morgan Stanley or transfer their account to Raymond James.

Both parties agree that if O'Brien has breached the Protocol then the restrictive covenants in his Agreement are applicable. The Court finds that Morgan Stanley has established that it is likely to prevail on its claim that O'Brien

9

has breached both the Protocol and the non-solicit and confidentiality clauses of his Agreement.

Further, because it is likely that O'Brien has violated the Protocol, it is also likely that the client information he took upon his resignation constitutes a trade secret to which his new firm, Raymond James, has no more right of access than does a non-signatory to the Protocol.  O'Brien has affirmed that he took from Morgan Stanley upon his resignation a list containing client information.  This client information (including customer names, addresses, and telephone numbers) falls explicitly within the definition of "Trade Secrets" in his Agreement, which includes "the names, addresses, telephone numbers, and assets and obligations carried in the accounts of Morgan Stanley's customers."  [Dkt. #1, Agreement, ¶2.1].  By contacting Morgan Stanley's clients after his resignation, O'Brien violated the confidentiality clause in his Agreement which proscribes the removal of Trade Secrets from Morgan Stanley's premises and their use for any purpose other than conducting the business of Morgan Stanley.  [Dkt. #1, Agreement, ¶2.3].  As O'Brien has admitted that he has contacted his former clients for the express purpose of soliciting them for his new firm, he has also violated the twelve month non-solicit clause of his Agreement.

Morgan Stanley has also established that the use of the client list will result in its irreparable injury.  This Court is persuaded by the rationale articulated in *Citigroup Global Markets Inc. v. Smith*, No. 3:09cv597 (JCH).  In *Smith*, the court granted Citigroup's request for injunctive relief where a broker took more information than she was entitled to take with her upon her resignation and move

10

to a non-signatory firm to the Protocol.  The defendant in that action was bound by nearly identical restrictive covenants as O'Brien and, upon her departure, took with her the names, addresses and telephone numbers of her Citigroup clients, who she then attempted to solicit for her new firm.  [*Citigroup Global Markets Inc. v. Smith*, 3:09-cv-597, #20, 4/20/09 Preliminary Injunction Hearing Transcript, 34:5-25, 35:1-11].  The court held that the broker's possession and use of the client information and her solicitation of the clients violated the confidentiality and non-solicit clauses in her employment agreement, which were akin to those in the present case, and that the client information the broker took from her former employer constituted a trade secret.  [*Id.* at 35:8-25].

The defendant in that action, as here, argued that the client information at issue could not constitute a trade secret because signatories to the Protocol have, in essence, agreed to share their client information with other broker firms.  The *Smith* court, however, opined that the Protocol "limits the disclosure of the trade secret information which I view to be customer lists in a way that preserves its trade secret status.  I come to that conclusion because I'm mindful of the requirements of the trade secret to get trade secret – to get the blanket of the trade secret categorization, one of the requirements is to not disclose the information to anyone beyond that necessary to use it, in effect." [*Id.* at 36:20 – 37:7].  O'Brien too has posited that the information he took from Morgan Stanley may not be classified as a trade secret because such information is routinely passed between firms upon a broker's resignation pursuant to the Protocol.  This Court is not persuaded.  To the contrary, client information subject to disclosure

11

under the Protocol is only subject to disclosure to the broker's new employer and not the brokerage community at large. The information is never made public and remains a trade secret subject to non-disclosure to any other person unless the broker complies with the Protocol again upon separation from the second brokerage firm.

This conclusion is buttressed by the Connecticut Unfair Trade Secrets Act, Conn. Gen. Stat. § 35–50 et seq., which defines a trade secret as "information, including a … customer list that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Conn. Gen. Stat. § 35-51(d). Statutory misappropriation of trade secrets includes "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." Conn. Gen. Stat. § 35-51(b)(1).

The parties do not dispute that the customer information at issue here – in the context of customer relationships with broker houses – is not readily ascertainable by those who can obtain economic value from its disclosure or use, *with the exception of disclosure pursuant to the Protocol*. The Protocol itself constitutes a reasonable measure to protect the secrecy of exactly this type of information, with the limited exception being that client information obtained by a broker who in good faith complies with the Protocol may inure to the benefit of that broker's new firm. Further, given that O'Brien violated the Protocol in bad

12

faith and by means designed to thwart the very agreement which would have afforded him protection for proper use of the trade secrets he appropriated, O'Brien knew or should have known that he had acquired the customer information from Morgan Stanley by improper means, thus constituting misappropriation of trade secrets.  Based on the foregoing, Morgan Stanley has demonstrated a likelihood of success on the merits as to its misappropriation claim.

Morgan Stanley has likewise demonstrated a likelihood of success on the merits as to its Connecticut Unfair Trade Practices Act ("CUTPA") claim.  CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat. § 42-110b(a).  Courts determine whether a practice violates CUTPA by analyzing

> (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons].

*Am. Car Rental, Inc. v. Comm'r of Consumer Prot.*, 273 Conn. 296, 305-06 (Conn. 2005) (internal quotations and citation marks omitted).  "All three criteria do not need to be satisfied to support a finding of unfairness.  A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three."  *Id*. at 306.

13

Here, O'Brien acted in bad faith when, for no purportedly innocent reason, he accessed Morgan Stanley's computer system and altered the telephone numbers of approximately 150 of his soon-to-be former clients in order to thwart Morgan Stanley's expedient communications with these clients. This conduct violates the spirit of the Protocol, an agreement between nearly one thousand brokerage firms that contains the procedure pursuant to which registered representatives must act when they depart from one firm and move to another. As noted, the Protocol's principal goal is "to further the clients' interests of privacy and freedom of choice in connection with the movement of their Registered Representatives [RRs] between firms." The intent of O'Brien's conduct appears to have been to directly impede Morgan Stanley's communication with its clients, which cannot be said to comply with the industry goal of fostering client choice and freedom of movement. Thus, O'Brien's actions both violated an established concept of fairness and were unethical, oppressive, and unscrupulous.

In sum, Morgan Stanley has established that it is likely that O'Brien has breached the spirit and purpose of the Protocol and, by virtue of this breach, that it is further likely that O'Brien has breached the restrictive covenants in his employment Agreement as well as having violated CUTPA and misappropriated trade secrets pursuant to the Unfair Trade Secrets Act.

**Irreparable Harm**

To establish irreparable harm, a party seeking injunctive relief must show that "there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation." *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (quotations omitted). Irreparable harm must be "actual and imminent, not remote or speculative." *Id*. Morgan Stanley contends that O'Brien's continued use of Morgan Stanley's customer information and solicitation of its customers constitutes irreparable harm by destroying many years of client marketing, goodwill, and reputation. O'Brien counters that Morgan Stanley has not demonstrated that it will suffer irreparable harm for which money damages are inadequate because O'Brien's alteration of the telephone numbers is a completed act and will cause no future harm, Morgan Stanley is a party to the Protocol, which was not breached, and monetary damages, which are calculable, are an adequate remedy for O'Brien's alteration of the telephone numbers and the brief delay it caused.

The Court agrees with the Plaintiff that O'Brien's calculated alteration of the customer telephone numbers, which led to a delay of several days in Morgan Stanley's ability to contact its clients, has caused irreparable harm for which money damages may not adequately compensate. Morgan Stanley argued at the hearing before this Court that the time lost in its ability to contact its customers may influence the light in which these customers view Morgan Stanley. Because O'Brien was able to contact customers immediately upon his resignation, and because Morgan Stanley could not, some customers likely experienced a delay in

15

receipt of a call from a Morgan Stanley financial analyst. These customers, in turn, may be apt to believe as a result of this delay that Morgan Stanley does not value their accounts and that they will receive lesser service than they would receive with O'Brien and Raymond James. This constitutes not only a potential loss of customers and the potential for future business brought in by these customers, but also a loss of Morgan Stanley's goodwill and reputation.

Various courts have similarly held that loss of a company's goodwill constitutes irreparable harm. In *Citigroup Global Markets Inc. v. Smith*, the court issued a preliminary injunction enjoining a defendant from continuing to contact her former customers and ordering the return of client information pending FINRA arbitration. [3:09-cv-597, #20, 4/20/09 Preliminary Injunction Hearing Transcript; #19, 4/17/09 Order granting Motion for Preliminary Injunction]. Noting that there is a "public interest in the protection of the goodwill of businesses," the court explained that "a former employee who, in effect, takes [or attempts to take] a client from their former employer in violation of an employment contract, that is irreparable harm. . . . Initially it would be very difficult to calculate money damages that would successfully address the loss of the relationship with a client that would produce an indeterminate amount of business for years to come." [*Citigroup Global Markets Inc. v. Smith*, 3:09-cv-597, #20, 4/20/09 Preliminary Injunction Hearing Transcript, 38:23-25, 41:10 – 42:3]. *See also DeWitt Stern Grp., Inc. v. Eisenberg*, 13 CIV. 3060 RWS, 2013 WL 2420835 (S.D.N.Y. June 4, 2013) (internal citation and quotation marks omitted) (finding irreparable harm and issuing injunctive relief where insurance broker solicited

16

former employer brokerage firm's clients, several of whom moved to new brokerage firm, and sent confidential company property to his new firm, and concluding that "[i]rreparable harm to an employer results through both the loss of client relationships and customer goodwill from a breach of a non-compete clause, and where an employee has misappropriated trade secrets or confidential customer information, including pricing methods, customer lists and customer preferences."); *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 49 (2d Cir. 1999) (holding that "loss of trade secrets cannot be measured in money damages because a trade secret once lost is, of course, lost forever," and issuing preliminary injunction where employer established that former employee's use of list containing client information would result in irreparable harm).

Moreover, O'Brien himself covenanted in his Agreement that "Morgan Stanley will suffer immediate and irreparable harm and that money damages will not be adequate to compensate Morgan Stanley or to protect and preserve the status quo pending arbitration [in the event of a breach of O'Brien's obligations concerning Trade Secrets or the non-solicit clause of his Agreement]."  [Dkt. #1, Agreement, ¶4.1].  While this Agreement cannot provide the legal conclusions that fall within this court's province alone, O'Brien's assent to this Agreement demonstrates his knowledge and agreement of the severity of a breach of the restrictive covenants to which he agreed.

The Court thus holds that a violation that compromises a company's goodwill, as here, is irreparable and continuing.  Morgan Stanley's failure to contact these customers for several days tended to undermine the goodwill it had

17

built with its customers over the course of, in some cases, many years.  This delay and the loss of goodwill it has engendered may not be remedied by money damages.  Rather, Morgan Stanley is entitled to level the informational playing field rendered uneven by O'Brien's deceit and to attempt to make up the gap by communicating with the clients whose contact information O'Brien altered by pitching the merits of their services over O'Brien's.  The grant of preliminary injunctive relief would mitigate the unfair advantage that O'Brien created for himself when he violated the terms of and undermined and subverted the express purpose of the Protocol by allowing Morgan Stanley to attempt to salvage its relationships with customers that may have been damaged by O'Brien's unfair conduct.

Plaintiff's motion and Defendant's opposition having been heard by the Court, and the Court having reviewed the entirety of the record in this case, it is ORDERED that, pursuant to Fed. R. Civ. P. 65 and until further order of this Court or decision by a FINRA arbitration panel:

1. Defendant is directed, along with his agents, employees, and representatives, and all those in active concert or participation with him and/or his agents, employees, and representatives, to return to Morgan Stanley within 24 hours any and all documents and computerized materials including, without limitation, all customer information of any sort, and copies and/or extracts thereof (the "Confidential Information"), removed at any time from Morgan Stanley, and O'Brien is further directed not to retain any copies thereof, and to permanently remove any and all such

information (including data contained on computer software, hard drives, and/or personal digital assistants) from his possession and custody;

2. Defendant is enjoined, along with his agents, employees, and representatives, and all those in active concert or participation with him and/or his agents, employees, and representatives, from (a) using or disclosing in any way any of the Confidential Information to solicit Morgan Stanley customers, and (b) using in any way or furnishing to anyone any of the Confidential Information; and

3. Defendant is enjoined, along with his agents, employees, and representatives, and all those in active concert or participation with him and/or his agents, employees, and representatives, from soliciting or attempting to solicit, directly or indirectly, any customer O'Brien served, or whose name became known to O'Brien, while in the employ of Morgan Stanley.

This Order shall not apply with respect to any customer who had transferred his or her account from Morgan Stanley to Raymond James as of the date of the hearing on this matter, November 4, 2013.  This Order is further without prejudice to the Plaintiff's filing of a motion seeking an order respecting those customers who had transferred their accounts from Morgan Stanley to Raymond James as of November 4, 2013.

It is further ORDERED that the Plaintiff shall post a bond of $25,000 with the Court on or before November 8, 2013.  Said funds shall be deposited into an interest bearing account and the Clerk shall deduct from the income earned on

19

this investment a fee of ten percent (10%) of such income earned, whenever such income becomes available for deduction in the investment so held and without further order of the Court.

            IT IS SO ORDERED.


            _____/s/_____
            Hon. Vanessa L. Bryant
            United States District Judge

Dated at Hartford, Connecticut: November 6, 2013